# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| GARNETT HENDERSON, | : |
| | : |
| **Plaintiff,** | : |
| | : |
| v. | : **Case No.:** 2:21-cv-1087 |
| | : |
| MONONGAHELA VALLEY HOSPITAL, INC., | : |
| | : |
| | : **COMPLAINT IN CIVIL ACTION** |
| **Defendant.** | : |
| | : |

Filed on Behalf of Plaintiff:
Garnett Henderson

Counsel of Record for this Party:
**J.P. WARD & ASSOCIATES**
Joshua P. Ward
Pa. I.D. No. 320347

J.P. Ward & Associates, LLC.
The Rubicon Building
201 South Highland Avenue
Suite 201
Pittsburgh, PA 15206

Telephone:     (412) 545-3015
Fax No.:       (412) 540-3399
E-mail:        jward@jpward.com

#### IN THE UNITED STATES DISTRICT COURT
#### FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| GARNETT HENDERSON, | : |
| | : |
| **Plaintiff,** | : |
| | : |
| v. | : Case No.: |
| | : |
| MONONGAHELA VALLEY HOSPITAL, INC., | : |
| | : |
| **Defendant.** | : |
| | : |

### COMPLAINT

AND NOW, comes Plaintiff, Garnett Henderson, by and through the undersigned counsel, J.P. Ward & Associates, LLC. and, specifically, Joshua P. Ward, Esquire, who files the within Complaint in Civil Action against Defendant, Monongahela Valley Hospital, Inc., of which the following is a statement:

### PARTIES

1.　Plaintiff, Garnett Henderson (hereinafter "Mr. Henderson"), is an adult individual who currently resides at 25 Manor Road, Donora, Pennsylvania 15033.

2.　Defendant, Monongahela Valley Hospital, Inc. (hereinafter "Monongahela Valley"), is a healthcare corporation located at 1163 Country Club Road, Monongahela, Pennsylvania 15063.

### JURISDICTION AND VENUE

3.　Jurisdiction is proper as Mr. Henderson brings this lawsuit under of the Civil Rights Act of 1866, 42 U.S.C. §1981 (hereinafter, "§1981"), Title VII of the Civil Rights Act of 1964, U.S.C. §2000e-5(f)(3) (hereinafter, "Title VII"), as amended by the Civil Rights Act of 1991 and

28 U.S.0 §§1343(a)(3) and (a)(4) and 1331, the Pennsylvania Human Relations Act (hereinafter, "PHRA"), 43 Pa. Cons. Stat. § 951 *et seq*. and the Wage Payment and Collection Law 43 P.S. §260.1 *et seq*. (hereinafter "WPCL").

4. This Court has supplemental jurisdiction over Mr. Henderson's state law claims pursuant to 28 U.S.C. § 1367(a).

5. Mr. Henderson is a resident and citizen of Pennsylvania, a substantial part of the events or omissions giving rise to the claims occurred in Western Pennsylvania, and, therefore, this action is within the jurisdiction of the United States District Court for the Western District of Pennsylvania and the venue is proper pursuant to 28 U.S.C. § 1391(b).

6. Mr. Henderson filed a timely charge with the Equal Employment Opportunity Commission ("EEOC") regarding his allegations and received a Dismissal and Notice of Rights on May 19, 2021. This complaint is now timely filed within 90 days of said notice. A true and correct copy of the Dismissal and Notice of rights is attached hereto, made a part hereof, and marked as Exhibit "A".

**PROCEDURAL HISTORY AND FACTUAL ALLEGATIONS**

7. On or about the year 2000, Mr. Henderson initiated employment with Monongahela Valley as a Therapeutic Recreation Specialist.

8. Mr. Henderson's position was supervisory in nature which required other employees to report directly to him.

9. Significantly, upon information and belief, Mr. Henderson was one of only a small number of African American employees employed at Monongahela Valley.

10. Shortly after beginning work as a Therapeutic Recreation Specialist, Mr. Henderson's supervisory privileges were taken away without explanation.

11. Thereafter, Mr. Henderson was denied promotions and raises despite the duration of his employment and satisfactory performance.

12. Throughout the COVID-19 pandemic beginning on or about March of 2020, Mr. Henderson wore an N95, NIOSH-approved mask while working within his unit. Mr. Henderson wore the protective mask for approximately six months prior to any issue being raised.

13. On or about August 20, 2020, Nurse Manager, John Bogden, (hereinafter, "Mr. Bogden"), asked Mr. Henderson to come into his office and demanded he wear the Monongahela Valley-provided blue surgical mask and speak with the Employee Health Nurse concerning his choice of mask.

14. Significantly, the Employee Health Nurse informed Mr. Henderson that she "had no power to change [Mr. Henderson's] choice of mask" and therefore deemed Mr. Henderson's N95 mask acceptable for the workplace.

15. Mr. Henderson shared the findings with Mr. Bogden who stated he was satisfied with the results of the meeting.

16. Following the aforementioned meeting and subsequent permission to continue to wear the N95 mask, Mr. Henderson received discriminatory and contradictory directives concerning his mask from his supervisors, including the Vice President of Nursing, Sherry Watkins, (hereinafter, Ms. Watkins").

17. Ms. Watkins repeatedly questioned and harassed Mr. Henderson for his choice of mask while allowing Mr. Henderson's Caucasian counterparts to either go without a mask entirely or wear masks improperly around the chin or neck.

18. Furthermore, it was common practice for Mr. Henderson's Caucasian counterparts to disregard Monongahela Valley's mask directive without consequence. Upon information and

belief, these coworkers were not reprimanded and received no discipline for their violation of Employer's mask policy.

19. Further, these Caucasian coworkers were not subjected to the same level of scrutiny as Mr. Henderson.

20. Additionally, Mr. Henderson was physically and verbally harassed by staff on multiple occasions for his choice of mask. On or about the week of August 16, 2020, multiple staff members began to harass and discriminate against Mr. Henderson for his choice of mask in front of others.

21. Mr. Henderson became alienated from the rest of his Caucasian coworkers and was portrayed to be the joke of the workplace. No Caucasian coworkers were harassed in this same fashion.

22. On or about August 24, 2020, Mr. Henderson was called into a meeting with Assistant Vice President of Nursing, "Lee", (hereinafter, "Lee"), Ms. Watkins, and Mr. Bogden.

23. During this meeting, Ms. Watkins demanded Mr. Henderson immediately visit the Employee Health Nurse to subject himself to a mask fit test.

24. Mr. Henderson followed orders and promptly visited the Employee Health Nurse for the fit test, to which he was degradingly sprayed with a colored-dye mist in and around his face to determine the "effectiveness" of his N95 mask.

25. Mr. Henderson's mask was deemed to have passed the fit test and Mr. Henderson was informed accordingly.

26. Additionally, Mr. Henderson requested Monongahela Valley provide him with a written version of their demands, to which they unequivocally refused.

27. Upon information and belief, no other employee was subjected to this so-called "mask test."

28. On or about August 25, 2020, Mr. Henderson was informed his mask was insufficient for workplace use and Mr. Henderson was ordered to wear a different mask.

29. Due to Mr. Henderson's continued observation of Caucasian coworkers incorrectly, or flatly refusing, to wear a mask, he inquired as to why he was being singled-out for mask.

30. Mr. Henderson was not provided any further information or instruction regarding his inquiry.

31. Subsequent to these requests, fifteen minutes before the end of his shift, Mr. Henderson was confronted by "Lee" and was forced to leave the workplace. Additionally, Mr. Henderson was informed not to return until he had spoken with the Human Resources Department.

32. Mr. Henderson protested but was promptly denied a reasonable, nondiscriminatory explanation for his forced removal from the workplace and for his subjection to the "mask fit test."

33. Per Monongahela Valley's orders, Mr. Henderson left the premises.

34. Furthermore, upon information and belief, Mr. Henderson was the only employee to be disciplined concerning masking requirements in the workplace.

35. On or about September of 2020, Mr. Henderson received a letter from Monongahela Valley stating his failure to respond would be construed as his formal resignation.

36. In his over 20 years of employment with Monongahela Valley, Mr. Henderson never received a negative performance review or any other indicated that his work was less than satisfactory.

37. As a result of the racially motivated discrimination Mr. Henderson was forced to endure and the disparate treatment, Mr. Henderson was effectively terminated.

38. Monongahela Valley failed to provide Mr. Henderson with further justification as to his disparate treatment in the workplace, as Mr. Henderson's N95 mask was deemed acceptable by Monongahela Valley's Employee Health Nurse.

39. Significantly, upon information and belief, no other employee was subject to the mask fit test or harassed for their choice of mask.

40. Furthermore, pursuant to the terms of employment, Mr. Henderson accrued paid time off ("PTO").

41. As of the date of this Complaint, Mr. Henderson has been denied compensation for approximately 150 hours of vacation time which he was entitled.

42. Upon information and belief, from the time of Mr. Henderson's effective termination to present, Monongahela Valley requires all employees to wear full personal protective equipment ("PPE") at all times while on the premises.

## COUNT I
### RACIAL DISCRIMINATION IN VIOLATION OF
### TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 AND
### THE PENNSYLVANIA HUMAN RLEATIONS ACT

43. Mr. Henderson incorporates the allegations contained in the paragraphs, above, as if fully set forth at length herein.

44. Under Title VII of the Civil Rights Act of 1964 (hereinafter "Title VII"), it is illegal for an employer to "fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C.A. §2000e-2(a)(1).

45. When analyzing a claim of discrimination under Title VII, a plaintiff must show: "(1) he is a member of a protected class; (2) he was qualified for the position he sought to attain

or retain; (3) he suffered an adverse employment action; and (4) either similarly-situated non-members of the protected class were treated more favorably or the action occurred under circumstances that could give rise to an inference of intentional discrimination." *Langley v. Merck & Co.*, 186 Fed Appx. 258 (3d Cir. 2006) (citing *McDonnell Douglas Corp. v. Green*, 36 L. E.D. 29 668 (1973). See also *Makky v. Chertoff*, 542 F.3d 205, 214 (3d Cir. 2008).

46. The same legal standards apply to Title VII and PHRA claims. *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 791 (3d Cir. 2016) (citing *Goosby v. Johnson & Johnson Med.*, Inc., 228 F.3d 313, 317 (3d Cir. 2000)). Further, the same standards apply to claims under Title VII and the PHRA on a summary judgment motion. *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999). Accordingly, the Court's analysis of the Title VII claims also applies to the PHRA claims. *Phillips v. Septa*, CIVIL ACTION NO. 16-0986, 6-7 (E.D. Pa. Feb. 12, 2018).

47. Pennsylvania courts have determined that an adverse employment action is "an action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Jones v. SEPTA*, 796 F.3d 323, 326 (3d Cir. 2015) (quoting *Storey v. Burns Int'l Sec. Serv.*, 390 F.3d 760, 764 (3d Cir. 2004)).

48. Under Title VII, for other employees to be considered "similarly situated," they must have "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Morales v. Pnc Bank, N.A.*, 2012 U.S. Dist. LEXIS 143605 *23 (E.D. Pa. 2012).

49. Pennsylvania courts have held that comparison factors for "similarly situated employees" have included "dealing with the same supervisor, having been subject to the same standards, and engaging in the same conduct without differentiating and mitigating circumstances." *Id.*

50. A plaintiff may also satisfy the fourth element by "showing other circumstances that give rise to an inference of unlawful discrimination." *Senador v. Zober Indus.*, 2009 U.S. Dist. LEXIS 36059 *9 (E.D. Pa. 2009).

51. Mr. Henderson was an African American employee at Monongahela Valley and was consistently regarded in a fashion that was different from his Caucasian counterparts.

52. Mr. Henderson was qualified for his position and did not receive or require any disciplinary action during his employment with Monongahela Valley.

53. Mr. Henderson faced discriminatory treatment in the form of the revocation of his supervisory privileges without explanation and his ongoing denial of promotions and raises despite his expertise and satisfactory performance.

54. Further, upon the onset of COVID-19 on or about March of 2020, Mr. Henderson was viewed at a heightened level of scrutiny in relation to the masking directives at Monongahela Valley.

55. Mr. Henderson wore an N95, NIOSH-approved mask while working within his unit for approximately six months prior to any issue being raised.

56. On or about August 20, 2020, Mr. Henderson was instructed to speak with the Employee Health Nurse concerning his choice of mask.

57. Although Mr. Henderson's mask was deemed acceptable for the workplace, he continued to receive discriminatory and contradictory directives concerning his mask from his supervisors, specifically, Ms. Watkins.

58. Ms. Watkins repeatedly questioned and harassed Mr. Henderson for his choice of mask while allowing Mr. Henderson's Caucasian counterparts to either go without a mask entirely or wear masks improperly around the chin or neck.

59. Furthermore, it was common practice for Mr. Henderson's Caucasian counterparts to disregard Monongahela Valley's mask directive without consequence. Upon information and belief, these coworkers were not reprimanded and received no discipline for their violation of Employer's mask policy.

60. Additionally, Mr. Henderson was physically and verbally harassed by staff on multiple occasions for his choice of mask.

61. On or about August 24, 2020, Mr. Henderson was forced to endure a mask fit test, to which he was degradingly sprayed with a colored-dye mist in and around his face to determine the "effectiveness" of his N95 mask. Upon information and belief, no other employee was subjected to this so-called "mask test."

62. Although Mr. Henderson's mask was deemed to have passed the fit test, the following day, Mr. Henderson was informed his mask was insufficient for workplace use and Mr. Henderson was ordered to wear a different mask.

63. Due to Mr. Henderson's continued observation of Caucasian coworkers incorrectly, or flatly refusing, to wear a mask, he inquired as to why he was being singled-out for mask, to which he was provided with no further justification.

64. Subsequent to these requests, fifteen minutes before the end of his shift, Mr. Henderson was confronted by "Lee" and was forced to leave the workplace and informed not to return until he had been instructed to do so by the Human Resources Department.

65. On or about September of 2020, Mr. Henderson received a letter from Monongahela Valley stating his failure to respond would be construed as his formal resignation.

66. As a result of the racially motivated discrimination Mr. Henderson was forced to endure and the disparate treatment, Mr. Henderson was constructively terminated.

67. As a direct and proximate cause of the aforementioned conduct, Mr. Henderson suffered actual damages, including, but not limited to, wage loss, loss of income, and emotional distress damages, all in the past, present and future.

68. As set forth hereinabove, Monongahela Valley's actions were intentional, knowing, wanton, willful, and so outrageous as to shock the conscience.

WHEREFORE, Plaintiff, Mr. Henderson, hereby requests this Honorable Court consider the above and grant relief in his favor. Specifically, Plaintiff requests this Court award him back pay, front pay, any other compensatory and punitive damages as calculated by the Court, pre-judgment and continuing interest as calculated by the Court, and reasonable attorney's fees.

## COUNT II
## RACIAL DISCRIMINATION IN
## VIOLATION OF SECTION 1981

69. Mr. Henderson incorporates the allegations contained in the paragraphs, above, as if fully set forth at length herein.

70. 42 U.S.C. § 1981(a) provides that:

> "[a]ll persons within the jurisdiction of the United States shall have the same right … to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws …as is enjoyed by white citizens."

*Johnson v. Ry. Exp. Agency, Inc.*, 421 U.S. 454, 460 (1975) (holding that Section 1981 "affords a federal remedy against discrimination in private employment on the basis of race."); see also, *Comcast Corp. v. Natl. Assn. of African Am.-Owned Media*, 140 S. Ct. 1009, 1010 (2020).

71. Thus, Section 1981 prohibits employers from engaging in intentional racial discrimination.

72. Throughout Mr. Henderson's employment, he faced discriminatory treatment in the form of the revocation of his supervisory privileges without explanation and his ongoing denial of promotions and raises despite his expertise and satisfactory performance.

73. Additionally, Monongahela Valley employed a disparate approach to disciplining Caucasian and African American employees concerning mask directives, further illustrating the discriminatory animus and culture present at Monongahela Valley.

74. Mr. Henderson received discriminatory and contradictory directives concerning his mask from his supervisors while his Caucasian counterparts were permitted to either go without a mask entirely or wear masks improperly around the chin or neck.

75. Despite Mr. Henderson's inquiries into Monongahela Valley's heightened level of scrutiny pertaining to his choice of mask and forced "mask fit test", Monongahela Valley refused to provide Mr. Henderson with further, nondiscriminatory rationale.

76. Additionally, Mr. Henderson was physically and verbally harassed by staff on multiple occasions for his choice of mask, to which his superiors were aware.

77. Further, on or about August 25, 2020, Monongahela Valley forced Mr. Henderson to leave the workplace and was informed not to return until he had spoken with the Human Resources Department.

78. As a result of Monongahela Valley's discriminatory and disparate approach to disciplining and promoting Caucasian and African American employees, Mr. Henderson was effectively terminated from his employment.

79. Therefore, Monongahela Valley permitted, condoned, and perpetuated the racial discrimination of Mr. Henderson in the workplace by his coworkers and superiors, and therefore

deprived him of the same right to make and enforce contracts as is enjoyed by white citizens, in violation of the Civil Rights Act of 1866, 42 U.S.C. §1981.

80. Monongahela Valley's actions against Mr. Henderson were undertaken with reckless indifference to Mr. Henderson's federally protected right to make and enforce contracts irrespective of his race.

81. As a result of Monongahela Valley's race discrimination against Mr. Henderson, Mr. Henderson has suffered and continues to suffer damages, including but not limited to lost wages and benefits, anxiety, loss of reputation, lost career opportunities, emotional distress, humiliation and inconvenience.

WHEREFORE, Plaintiff, Mr. Henderson, hereby requests this Honorable Court consider the above and grant relief in his favor. Specifically, Plaintiff requests this Court award him back pay, front pay, any other compensatory and punitive damages as calculated by the Court, pre-judgment and continuing interest as calculated by the Court, and reasonable attorney's fees.

## COUNT III
### RETALIATION IN VIOLTION OF
### TITLE VII AND THE PHRA

82. Mr. Henderson incorporates the allegations contained in the paragraphs, above, as if fully set forth at length herein.

83. To establish a prima facie case of retaliation under Title VII, a plaintiff must provide evidence that: (1) he "engaged in activity protected by Title VII"; (2) the employer took an "adverse employment action" against him; and (3) there was a "causal connection" between his "participation in the protected activity and the adverse employment action." *Kengerski v. Allegheny Cty.*, 435 F. Supp. 3d 671, 676 (W.D. Pa. 2020) (citing to *Moore v. City of Philadelphia*,

461 F.3d 331, 341-42 (3d Cir. 2006); See also, *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995)).

84. The analytical framework used to evaluate a claim under the PHRA is effectively indistinguishable from that under Title VII. See *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 409 (3d Cir. 1999).

85. Pennsylvania courts have determined that an adverse employment action is "an action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Jones v. SEPTA*, 796 F.3d 323, 326 (3d Cir. 2015) (quoting *Storey v. Burns Int'l Sec. Serv.*, 390 F.3d 760, 764 (3d Cir. 2004)).

86. "When the temporal proximity between the protected activity and adverse action is unduly suggestive, this is sufficient standing alone to create an inference of causality…" *Lichtenstein v. University of Pittsburgh Medical Center* 691 F.3d 294, at 307 (3d Cir.2012), citing *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3rd Cir.2007).

87. Mr. Henderson engaged in an activity protected by Title VII and the PHRA on or about August 25, 2020, by questioning the disparate treatment he had received related to his mask choice and forced participation in the "mask fit test", as he continued to observe of Caucasian coworkers incorrectly, or flatly refusing, to wear a mask.

88. Significantly, upon information and belief, no other employee was subject to the mask fit test or harassed for their choice of mask.

89. Rather than provide Mr. Henderson with any non-discriminatory rationale for the increased scrutiny pertaining to his mask choice and the "mask fit test", Monongahela Valley dismissed Mr. Henderson's report.

90. Subsequent to his report of his disparate treatment in the workplace, approximately fifteen minutes before the end of his shift, Mr. Henderson was forced to leave the workplace and informed not to return until he had spoken with the Human Resources Department.

91. Mr. Henderson protested but was promptly denied a reasonable, nondiscriminatory explanation for his forced removal from the workplace and for his subjection to the "mask fit test."

92. Therefore, a causal connection can be made from Mr. Henderson's complaints of disparate treatment and discrimination in the workplace and his forced removal from the premises at the end of his shift that same day and ultimate effective termination.

WHEREFORE, Plaintiff, Mr. Henderson, hereby requests this Honorable Court consider the above and grant relief in his favor. Specifically, Mr. Henderson requests this Court award him back pay, front pay, any other compensatory and punitive damages as calculated by the Court, pre-judgment and continuing interest as calculated by the Court, and reasonable attorney's fees.

## COUNT IV
## WPCL VIOLATIONS

93. Mr. Henderson incorporates the allegations contained in the paragraphs, above, as if fully set forth at length herein.

94. Section 260.5(a) of the WPCL provides:

> Whenever an employer separates an employee from the payroll, or whenever an employee quits or resigns his employment, the wages or compensation earned shall become due and payable not later than the next regular payday of his employer on which such wages would otherwise be due and payable.

43 P.S. §260.5(a).

95. Wages include "all earnings of an employee, regardless of whether determined on time, task, piece, commission, or other method of calculation. The term "wages" also includes fringe benefits or wage supplements…" 43 P.S. §260.2(a).

96. Fringe benefits or wage supplements include "separation, vacation, holiday, or guaranteed pay…" 43 P.S. §260.2(a).

97. Further, Section 260.4 of the WCPL provides:

> It shall be the duty of every employer to notify his employees at the time of hiring of the time and place of payment and the rate of pay and the amount of fringe benefits or wage supplements to be paid to the employee…and any change with respect to any of these items prior to the time of said change. Alternatively, however, every employer may give such notification by posting the aforementioned facts and keeping them posted conspicuously at the employer's place of business.

43 P.S. §260.4

98. Under the WPCL, the definition of employer "includes every person, firm, partnership, association, corporation, receiver or other officer of a court of this Commonwealth and any agent or officer of any of the above-mentioned classes employing any person in this Commonwealth." 43 P.S. §260.2a.

99. The Pennsylvania WPCL, 43 P.S. §260.1 et seq., however, does not provide "a statutory definition of the term 'employee'." *Frank Burns, Inc. v. Interdigital Communs. Corp*, 704 A.2d 678, 680-81 (Pa Super. 1997).

100. Courts in Pennsylvania have held that "any person in Pennsylvania can qualify as an employee under the WPCL," because "grammatically, an 'employee' is an entity that is employed," and "in the definition of employer, the entity employed by the employer, i.e., the employee, is any person in Pennsylvania." *Frank Burns v. Interdigital Communs. Corp.*, at 681.

101. Pennsylvania courts have thus narrowed the definition of employee accordingly: "those who work in Pennsylvania can sue under the Pennsylvania statute, but those who do not work in Pennsylvania cannot." Id. Citing *Killian v. McCulloch*, 873 F. Supp. 938, 942 (E.D. Pa. 1995).

102. As a company in the Commonwealth of Pennsylvania, Monongahela Valley is an employer within the definition of the WPCL 43 Pa. C.S. §260.1a.

103. Mr. Henderson was an employee of Monongahela Valley working within the Commonwealth of Pennsylvania.

104. Mr. Henderson had accumulated and was owed approximately 150 hours of paid vacation hours.

105. Mr. Henderson has not been paid for his entitled accrued paid time off.

106. By failing to pay Mr. Henderson the benefits he is owed, Monongahela Valley violated 43 P.S. §260.5(a) of the WPCL.

107. As a direct and proximate result of the aforementioned conduct, Mr. Henderson suffered actual damages, including, but not limited to, lost wages, emotion distress all in the past present and future.

WHEREFORE, Plaintiff, Mr. Henderson respectfully requests this Honorable Court enter judgment in their favor and against Defendant and enter any and all wages of paid time off or vacation pay due to Plaintiff, as well as attorney's fees and liquidated damages pursuant to 43 P.S. §260.9 of the Wage Payment and Collection Law.

## COUNT V
## BREACH OF CONTRACT

108. Mr. Henderson incorporates the allegations contained in the paragraphs above as if fully set forth at length herein.

109. Mr. Henderson entered into a written agreement with Monongahela Valley for employment. This written agreement included paid time off which accrued over time.

110. Monongahela Valley failed to compensate Mr. Henderson for approximately 150 hours of this accrued paid time off.

111. The same constitutes a material breach of contract.

112. Mr. Henderson was deprived of the substantial benefit of their agreement as a result of Monongahela Valley's material breach of the parties' agreement.

113. All conditions precedent to recovery have occurred.

114. Mr. Henderson has suffered and will continue to suffer damages as the result of Monongahela Valley's breach.

WHEREFORE, Plaintiff, Mr. Henderson, respectfully requests that this Honorable Court grant judgment in his favor and against Defendant in an amount within arbitration limits, including actual damages, treble damages, punitive damages plus costs, interest, attorney fees and such other relief as this Court may deem appropriate.

## COUNT VI
## UNJUST ENRICHMENT
### *(Pled in the Alternative to Count V)*

115. Mr. Henderson incorporates the allegations contained in the paragraphs above as if fully set forth at length herein.

116. In the alternative to Mr. Henderson's breach of contract claim, Monongahela Valley is liable to Mr. Henderson for unjust enrichment.

117. Mr. Henderson conferred a benefit upon Monongahela Valley.

118. Monongahela Valley appreciated the benefit of Mr. Henderson's time and efforts.

119. Mr. Henderson possessed an expectation in which he would be properly compensated for any and all entitlements and forms of compensation.

120. It would be manifestly unjust if the Monongahela Valley's acceptance and retention of such benefits were permitted without payment of value to Mr. Henderson.

121. As a direct and proximate cause of the aforementioned conduct, Mr. Henderson suffered actual damages, including, but not limited to, wage loss, loss of income.

WHEREFORE, Plaintiff, Mr. Henderson, respectfully requests that this Honorable Court grant judgment in his favor and against Defendant in an amount within arbitration limits, including actual damages, treble damages, punitive damages plus costs, interest, attorney fees and such other relief as this Court may deem appropriate.

## COUNT VII
## BREACH OF IMPLIED CONTRACT

122. Mr. Henderson incorporates the allegations contained in the paragraphs, above, as if fully set forth at length herein.

123. Under Pennsylvania law, "an implied-in-fact contract is a true contract arising from mutual agreement and intent to promise, but where the agreement and promise have not been verbally expressed. The agreement is inferred from the conduct of the parties." In re *Penn Cent. Transp. Co.*, 831 F.2d 1221, 1228 (3d Cir. 1987).

124. "'A contract, implied in fact, is an actual contract which arises where the parties agree upon the obligations to be incurred, but their intention, instead of being expressed in words, is inferred from their acts in the light of the surrounding circumstances.'" *Rissi v. Cappella*, 918 A.2d 131, 140 (Pa. Super. 2007) (quoting *Martin v. Little, Brown and Co.*, 450 A.2d 984, 987 (1981)).

125. Mr. Henderson and Monongahela Valley were parties to an implied contract.

126. The implied agreement provided that Mr. Henderson be provided with paid time off by Monongahela Valley.

127. From initiation of Mr. Henderson's employment, Monongahela Valley allowed Mr. Henderson to accrue paid time off.

128. As of the filing date of this Complaint, Monongahela Valley has not paid Mr. Henderson for approximately 150 hours of paid time off.

129. As a result of its failure to pay Mr. Henderson the abovementioned paid time off, Monongahela Valley has materially breached the implied contract with Mr. Henderson.

130. As a direct and proximate result of the conduct of Monongahela Valley, having breached the implied contract as a whole, Mr. Henderson has suffered actual damages in the loss of wages for approximately 150 hours of paid time off, and is entitled to recover the same.

WHEREFORE, Plaintiff, Mr. Henderson, respectfully requests this Honorable Court enter judgment in his favor and against Defendant and enter any and all monetary damages as described herein due to Plaintiff, including an award for actual damages, damages pursuant to emotional distress, in excess of arbitration limits, and such other relief as this Honorable Court deems just and proper.

**JURY TRIAL DEMANDED UPON ALL MATTERS DEEMED TRIABLE.**

Respectfully Submitted,

**J.P. WARD & ASSOCIATES, LLC**

Date: August 16, 2021

By:_____
Joshua P. Ward (Pa. I.D. No. 320347)
Kyle H. Steenland (Pa. I.D. No. 327786)

J.P. Ward & Associates, LLC
The Rubicon Building
201 South Highland Avenue
Suite 201
Pittsburgh, PA 15206

Counsel for Plaintiff